1

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Tel: (914) 874-0710
Fax: (914) 206-3656
E-Mail: pfraietta@bursor.com

*Counsel for Plaintiff*

2

3

4

5

6

7

8

9

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| JULIETTE BLATT, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>  v.<br><br>BAREFOOT DREAMS, INC.,<br><br>      Defendant. | Case No.  5:25-cv-8791<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

1    Plaintiff Juliette Blatt brings this action on behalf of herself, and all others similarly situated

2    (the "Class Members"), against Defendant Barefoot Dreams, Inc. ("Defendant" or "Barefoot

3    Dreams").  Plaintiff makes the following allegations pursuant to the investigation of her counsel

4    based upon information and belief, except as to allegations specifically pertaining to herself, which

5    are based on personal knowledge.

6                                    **NATURE OF THE ACTION**

7    1.    This is a class action lawsuit brought on behalf of all U.S. residents who accessed

8    and navigated www.barefootdreams.com (the "Website") and whose electronic communications

9    were intercepted or recorded by advertising technology provided by Meta Platforms, Inc.

10   ("Facebook" or "Meta") and Attentive Mobile Inc. ("Attentive") (collectively "Third Parties").

11   2.    Barefoot Dreams is "the premier destination for cozy blankets, loungewear and

12   apparel for the whole family . . . ."[1]  The Barefoot Dreams collection "features a variety of soft and

13   luxurious blankets and throws, newborn, toddler and kids wear and chic lounge wear and apparel

14   for adults"[2] which it sells and markets through the Website.

15   3.    Despite its promises and representations of privacy, Defendant aids, agrees with,

16   employs, or otherwise enables Third Parties to eavesdrop on communications sent and received by

17   Plaintiff and Class Members on the Website that Defendant owns and operates, including

18   communications that contain personally identifiable information ("PII").  By failing to procure

19   consent before enabling Third Parties to intercept these communications, Defendant violated the

20   Electronic Communications Privacy Act ("ECPA") (18 U.S.C. §2511, *et seq.*), the California

21   Invasion of Privacy Act ("CIPA") § 631, CIPA § 632, the Comprehensive Computer Data and

22   Access and Fraud Act ("CDAFA") § 502, and the California Constitution.

23                                            **PARTIES**

24   *Plaintiff*

25   4.    Plaintiff Juliette Blatt is a resident and citizen of Morgan Hill, California.  At all

26   relevant times, Plaintiff maintained an active account with Facebook.  When creating her Facebook

---

[1] BAREFOOT DREAMS, *About Us*, https://www.barefootdreams.com/pages/about-us.

[2] BAREFOOT DREAMS, Bar*About Us*,

account, Plaintiff provided Facebook with her PII, including her full name, date of birth, phone number, and email address.  Plaintiff used the same device to access the Website that she did to access her Facebook account.  Plaintiff was in California when she visited the Website and rejected the tracking of her information while on Defendant's Website.

5.    On or around May 25, 2025, Plaintiff accessed Defendant's Website—while in California—and purchased an Island Wrap and Blanket Wrap.  Despite Defendant's representations of confidentiality, Plaintiff's communications during this visit were intercepted and disclosed to Third Parties through the tracking technologies, including communications that contained Plaintiff's identity and information about her purchases.  Neither Defendant nor the Third Parties procured Plaintiff's consent prior to these interceptions, nor was Plaintiff on notice of the fact that such interceptions were occurring.  Such disclosures are a violation of Plaintiff's privacy and were done intentionally for targeted advertising purposes.

***Defendant***

6.    Defendant Barefoot Dreams, Inc. is a California corporation, headquartered in Agoura Hills, California.  Defendant owns and operates the Website.

7.    Defendant knowingly and intentionally incorporated a host of tracking technology for marketing, advertising, and analytics purposes on the Website without disclosure to its users, including tracking technologies provided by Third Parties.

8.    Defendant configured the Tracking Technologies such that even if a customer rejected their use, the Tracking Technologies continued to intercept their identity purchase information. Defendant chose to do so despite the privacy representations it made to consumers.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511).  This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.  Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed

1    class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of

2    the proposed class is a citizen of a state different from Defendant.

3        10.    This Court has personal jurisdiction over Defendant is a California corporation that

4    purposefully directs its business activities in this District by offering its products to residents of this

5    District and performing services in this.  Further, Plaintiff was residing in this District when she

6    accessed the Website and had the Tracking Technologies installed on her device, which Defendant

7    knew would cause harm throughout California, including within this District.

8        11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant

9    does substantial business in this District, a substantial part of the events giving rise to the claim

10   occurred in this District, and Plaintiff resides in this District.

11                          <u>FACTUAL ALLEGATIONS</u>

12   **A.    Defendant's Website and Privacy Representations**

13       12.    Defendant owns and operates the Website.  Unbeknownst to customers, Defendant

14   integrates tracking codes from Meta and Attentive into the Website (collectively the "Tracking

15   Technologies").

16       13.    Through its Website, Defendant promises customers that it will keep their

17   personally identifiable electronic communications confidential.

18       14.    When a customer first accesses the Website, Defendant presents them with a

19   prominent cookie banner.  Defendant explains that the Website "uses cookies and other tracking

20   technologies to . . .  share information about [consumer's] use of [its] site with [its] social media,

21   advertising and analytics partners."[3] *See* Fig. 1.



**Figure 1**

---

[3] CᴏᴏᴋɪᴇSᴄʀɪᴘᴛ, *What are Targeting Cookies?* https://cookie-script.com/knowledge-base/kb-targeting-cookies.

15.    When a consumer clicks the "Do Not Sell or Share My Personal Information Button" Defendant explicitly warrants its performance cookies, when accepted, only collect data that "is aggregated and therefore anonymous."  Similarly, Defendant expressly warrants the targeting cookies on its site, when accepted, "do not store directly personal information."  *See* Fig. 2.



**Figure 2**

16.    Defendant also offers consumers an opportunity to reject these cookies stating if it has "detected an optout preference signal then it will be honored."  *See supra* Fig. 1.  Unbeknownst to consumers, this choice is illusory; Defendant shares sensitive details about its customers' identities and purchases even if the consumer rejects Defendant's cookie banner.

17.    Despite Defendant's claims it does not share directly personal information, (***Defendant makes this representation irrespective of whether a consumer accepts or rejects cookies***), Defendant enables third parties—including Facebook and Attentive—to that track consumers'—including Plaintiff's—Website browsing activities and eavesdrop on users' private communications on the Website.

18.    As courts across the country have recognized, the identifiers that the Tracking Technologies capture—names, email address, phone number, and social media IDs—constitute "directly personal information."  *See supra* Fig. 2.  By capturing this information, contrary to its explicit representation not to, Defendant fails to receive consent from customers to intercept their communications.

19.     Despite clear promises not to, Defendant transmits, and Third Parties intercept, sensitive information about Plaintiff and Class Members' identity and purchases.

**B.     Consumers Have A Financial Stake In Companies' Promises Relating To Their Data Privacy**

20.     "In an era where every click, tap or keystroke leaves a digital trail, Americans remain uneasy and uncertain about their personal data and feel they have little control over how it's used."[4]

21.     "The value of consumer data often comes from identifying users and combining their data from various sources.  This is possible, in part, through the ubiquity of personally identifiable information (PII) and unique identifiers, as well as identifying individuals from non-PII, such as aggregated or anonymized data.  The ability to identify users enables website and app operators to combine data and track user activity across devices."[5]

22.     "Advertisers, as well as website and app operators, have incentives to improve their ad targeting by collecting detailed information about each user.  Advertisers might expect more precise targeting to increase sales.  Websites' revenue may depend on how frequently users click on the ad or how much time users spend viewing the ad."[6]

23.     For retailers—like Defendant—the ability to compile consumer patterns into algorithms improves how precisely they can sell to those same consumers.[7]

24.     With increased surveillance of consumers' purchase patterns, consumer concern over the control of their data privacy has continued to grow:

- "86% of Americans are more concerned about their privacy and data security than the state of the U.S. economy – but two-thirds either don't know or are

---

[4] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *How Americans View Data Privacy*, PEW RESEARCH CENTER (October 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/

[5] CLARE Y. CHO & LING ZHU, CONG. RSCH. SERV., R47298, *Online Consumer Data Collection and Data Privacy*, (October 31, 2022), https://www.congress.gov/crs-product/R47298.

[6] Clare Y. Cho, CONG. RSCH. SERV., IF11448, *How Consumer Data Affects Competition Through Digital Advertising*, (January 26, 2023), https://www.congress.gov/crs-product/IF11448.

[7] Charles Duhigg, *How Companies Learn Your Secrets*, N.Y. TIMES, Feb. 16, 2012, https://www.nytimes.com/2012/02/19/magazine/shopping-habits.html (example of how Target used consumer characteristics to identify and market to pregnant women).

misinformed about how their data is being used and who has access to their privacy"[8]

- "67% of respondents don't understand what data privacy means or how their data is being used"[9]

- The public increasingly says they don't understand what companies are doing with their data. Some 67% say they understand little to nothing about what companies are doing with their personal data, up from 59%[10]

- 72% of Americans say there should be more [government] regulation than there is now; just 7% say there should be less. [11]

- Roughly four-in-ten Americans say they are *very* worried about companies selling their information to others without them knowing (42%) or people stealing their identity or personal information (38%).[12]

- 81% say they feel very or somewhat concerned with how companies use the data they collect about them. [13]

- People don't feel in control: Roughly three-quarters or more feel they have very little or no control over the data collected about them by companies (73%)[14]

- 36% strongly agree or somewhat agree they're in control of personal data. A third (29%) were concerned about how retailers and e-commerce companies use consumer data.[15]

- An overwhelming majority (85%) of consumers are taking at least one step to address their privacy and security concerns. However, 75% feel they should be doing more, and many indicate they feel a sense of powerlessness: They believe that companies can track them no matter what they do (26%), don't know what actions they can take (25%), and think hackers can access their data no matter what they do (21%).[16]

---

[8] Gary Drenik, *Data Privacy Tops Concerns For Americans – Who Is Responsible For Better Data Protections?*, FORBES, (Dec. 8, 2023) https://www.forbes.com/sites/garydrenik/2023/12/08/data-privacy-tops-concerns-for-americans--who-is-responsible-for-better-data-protections/.

[9] *Id.*

[10] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *How Americans View Data Privacy*, PEW RESEARCH CENTER, (Oct. 18, 2023) https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/.

[11] *Id.*

[12] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *Views of data privacy risks, personal data and digital privacy laws*, PEW RESEARCH CENTER, (Oct. 18, 2023) https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/

[13] *Id.*

[14] *Id.*

[15] *Survey Shows Consumers Concerned About Personal Data, Privacy and Internet Safety for Children*, KINETIC, (Jan. 24, 2025) https://www.windstream.com/blog/consumer-data-privacy-survey-2025.

[16] *New Deloitte Survey: Increasing Consumer Privacy and Security Concerns in the Generative AI Era*, DELOITTE, (Dec. 2, 2024) https://www.deloitte.com/us/en/about/press-room/increasing-consumer-privacy-and-security-concerns-in-the-generative-ai-era.html.

---

25.    This concern over data privacy also impacts consumer purchase behavior:

- 79% of Americans are concerned about how companies use their data.[17]
- 75% of Americans believe there should be more regulations to protect their privacy from companies collecting consumer data without their consent or knowledge. [18]
- 60% of users say they would spend more money with a brand they trust to handle their personal data responsibly.[19]
- 52% of American users chose not to use a product or service due to worries about how much personal data would be collected about them.[20]
- 48% of users have stopped buying from a company over privacy concerns.[21]
- 33% of users have terminated relationships with companies over data. They left social media companies, ISPs, retailers, credit card providers, and banks or financial institutions.[22]
- 81% of users say the potential risks they face from companies collecting data outweigh the benefits[23]

26.    Consumer concerns over their privacy have been addressed at both the state and federal levels by the California Legislature and the Federal Trade Commission.

---

[17] Brooke Auxier, Lee Rainie, Monica Anderson, Andrew Perrin, Madhu Kumar, & Erica Turner, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019) https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[18] Branka Vuleta, *18 Chilling Privacy Statistics in 2023*, LEGALJOBS (Jul. 22, 2025) https://legaljobs.io/blog/privacy-statistics.

[19] *Global Consumer State of Mind Report 2021,* TRUATA, https://www.truata.com/resources/report/global-consumer-state-of-mind-report-2021/.

[20] Andrew Perrin, *Half of Americans have decided not to use a product or service because of privacy concerns*, PEW RESEARCH CENTER, (Apr. 14, 2020) https://www.pewresearch.org/short-reads/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns/.

[21] Ratnesh Pandey, *Staying Cyber-Secure While Working From Home*, TABLEAU, (updated Jul. 18, 2024) https://public.tableau.com/app/profile/ratnesh2928/viz/Stayingcyber-securewhileworkingfromhome/Stayingcyber-securewhileworkingfromhome/.

[22] *Consumer Privacy Survey*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-cybersecurity-series-2021-cps.pdf.

[23] Brooke Auxier, Lee Rainie, Monica Anderson, Andrew Perrin, Madhu Kumar, & Erica Turner, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019) https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

---

**C.    The Federal Trade Commission and California Legislature's Protection of Consumer Data**

27.    The Federal Trade Commission has taken action "against dozens of companies that claimed to safeguard the privacy or security of users' information but didn't live up to their promises in the day-to-day operation of their business."[24]

28.    Notably, the Federal Trade Commission seeks enforcement against companies who violate their representations about safeguarding consumer information:

> When companies tell consumers they will safeguard their personal information, the FTC can and does take law enforcement action to make sure that companies live up these promises. The FTC has brought legal actions against organizations that have violated consumers' privacy rights, or misled them by failing to maintain security for sensitive consumer information, or caused substantial consumer injury. In many of these cases, the FTC has charged the defendants with violating Section 5 of the FTC Act, which bars unfair and deceptive acts and practices in or affecting commerce. In addition to the FTC Act, the agency also enforces other federal laws relating to consumers' privacy and security.[25]

29.    At the state level, the California Legislature is at the forefront of protecting citizens' privacy.  Take, for example, the California Online Privacy Protection Act, requiring companies to "conspicuously post [their] privacy policy" and "[d]isclose whether other parties may collect personally identifiable about an individual consumer's online activities over time and across different Web sites when a consumer uses the operator's Web site or service."[26]  This statute also defines "personally identifiable information ("PII")" as "[a] first and last name," "[a] home or other physical address," "[a]n e-mail address," "[a] telephone number," and "[a]ny other identifier that permits the physical or online contacting of a specific individual."[27]

---

[24] *Marketing Your Mobile App: Get It Right from the Start,* FEDERAL TRADE COMMISSION, https://www.ftc.gov/business-guidance/resources/marketing-your-mobile-app-get-it-right-start.

[25] *Privacy and Security* Enforcement, FEDERAL TRADE COMMISSION, https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement.

[26] Cal. Bus. & Prof. Code § 22575(a).

[27] Cal. Bus. & Prof. Code § 22575(a).

**D.**    **Overview of the California Invasion of Privacy Act and the Federal Wiretap Act**

30.    The California Legislature enacted CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

31.    The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*."  *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

32.    Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted); *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*).

33.    As part of CIPA, the California Legislature introduced § 631(a), which imposes liability for "distinct and mutually independent patterns of conduct."  *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978).  Specifically, CIPA § 631(a) prohibits any person or entity from:

> (i)    "intentionally tap[ping], or mak[ing] any unauthorized connection . . . with any telegraph or telephone wire";
>
> (ii)    "willfully and without the consent of all parties to the communication . . . read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing

over any wire, line, or cable, or is being sent from, or received at any place within [California]"; or

(iii)    "us[ing], or attempt[ing] to use . . . any information so obtained."

34.    CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with" or "permit[]" "any person" to conduct the aforementioned wiretapping.

35.    Individuals may bring an action against a violator of CIPA § 631 for $5,000 per violation.  Cal. Penal Code § 637.3.

36.    In a manner similar to CIPA, the Federal Wiretap Act (i.e. the ECPA) creates "a comprehensive scheme for the regulation of wiretapping and electronic surveillance."[28]

37.    Although the ECPA does not apply "where one parties to the communication has given consent[,]" the ECPA eliminates the one-party consent exception when the conduct was for the "the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."[29]

**E.    Function of the Tracking Technologies**

38.    Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications.  Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

39.    Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

40.    Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- HTTP Request: an electronic communication sent from a device's browser to the website's server.  GET Requests are one of the most common types of HTTP

[28] *People v. Roberts*, 184 Cal. App. 4th 1149, 1167 (2010).

[29] 18 U.S.C. § 2511(d)

Requests.  In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- Cookies: a small text file that can be used to store information on the device which can later be communicated to a server or servers.  Cookies are sent with HTTP Requests from devices to the host server.  Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request.  HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

41.     A consumers' HTTP Request essentially asks the website to retrieve certain information (such as payment submissions and user selections), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

42.     Every website is comprised of Markup and "Source Code."  Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

43.     Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.  The Meta Pixel and Attentive tracking code embedded on the Website by Defendant constitute Source Code.

**F.     Meta's Tracking Technology**

44.     Meta is one of the largest advertising companies in the country. To date, Meta generates nearly 98% of its revenue through advertising, [30] bringing in an excess of $160 billion in 2024.[31]

---

[30] Emmanuel Oyedegi, *Meta's ad business generated 98% of its total revenue in Q2 2025*, TECHLOY (Jul. 31, 2025) https://www.techloy.com/metas-ad-business-generated-98-percent-of-its-total-revenue-in-q2-2025/.

[31] Stacy Jo Dixon, *Meta's ad business generated 98% of its total revenue in Q2 2025*, STATISTA (Jan. 30, 2025) https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/?srsltid=AfmBOopC65RAw3WSm3y4ZtdYBpTiXhsmiFK7kSnFcm14WOV7esTu_uQ

45.    Meta's advertising business began back in 2007 with the creation of "Facebook Ads," which was marketed as a "completely new way of advertising online" that would allow "advertisers to deliver more tailored and relevant ads." [32]

46.    Today, Meta provides advertising on its own platforms, such as Facebook and Instagram, as well as websites outside these apps through the Facebook Audience Network. Facebook alone has more than 3 billion active users. [33]

47.    Meta's advertising business has been extremely successful due, in large part, to Meta's ability to target people at a granular level. "Among many possible target audiences, [Meta] offers advertisers," for example, "1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'" [34]

48.    Given the highly specific data used to target specific users, it is no surprise that millions of companies and individuals utilize Meta's advertising services. Meta generates substantially all of its revenue from selling advertisement placements:[35]

**Table 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|--------------|------------|--------------|
| 2021 | $117.93 billion | $114.93 billion | 97.46% |
| 2020 | $85.97 billion | $84.17 billion | 97.90% |
| 2019 | $70.70 billion | $69.66 billion | 98.52% |
| 2018 | $55.84 billion | $55.01 billion | 98.51% |

49.    One of Meta's most powerful advertising tools is the Meta Pixel, formerly known as

_https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/?srsltid=AfmBOopC65RAw3WSm3y4ZtdYBpTiXhsmiFK7kSnFcm14WOV7esTu_uQ _

[32] Cecile Ho, *Announcing Facebook Pixel*, META (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

[33] Naveen Kumar, *Facebook Users Statistics (2025) – Latest Worldwide Data*, DEMANDSAGE (Aug. 19, 2015) https://www.demandsage.com/facebook-statistics/.

[34] Natasha Singer, *What You Don't Know About How Facebook Uses Your Data*, NEW YORK TIMES (Apr. 11, 2018) https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html.

[35] *Facebook Ad Revenue (2017–2027)*, OBERLO, https://www.oberlo.com/statistics/facebook-ad-revenue.

the Facebook Pixel, which launched in 2015 and its SDK.

50.     Meta touted the Meta Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." According to Meta, to use Meta Pixel an advertiser need only "place a single pixel across [its] entire website to report and optimize for conversions" so that the advertiser could "measure the effectiveness of [its] advertising by understanding the action people take on [its] website."[36]

51.     The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activity as the users navigate through a website. As soon as a user takes any action on a webpage that includes the Meta Pixel, the code embedded in the page re-directs the content of the user's communication to Meta while the exchange of the communication between the user and website provider is still occurring.

52.     Through this technology, Meta intercepts each page a user visits, what buttons they click, as well as specific information they input into the website and what they searched. The Meta Pixel sends each of these pieces of information to Meta with other identifiable information, such as the user's IP address. Meta stores this data on its own server, in some instances, for years on end.

53.     This data is often associated with the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits Defendant's Website, Meta receives third-party cookies allowing Meta to link the data collected by Meta Pixel to the specific Facebook user.

54.     For example, Meta uses cookies named c_user, datr, fr and fbp to identify its account holders.  Meta stores or updates Meta-specific cookies every time a person accesses their Facebook account from the same web browser.

55.     The Meta Pixel can access these cookies and send certain identifying information like the user's Facebook ID to Facebook along with the other data relating to the user's website inputs.

56.     The c_user cookie value is the Facebook equivalent of a user identification number.

---

[36] Cecile Ho, *Announcing Facebook Pixel*, META (Oct. 14, 2015)
https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

1    Each Facebook user account has one—and only one—unique c_user cookie.  Facebook uses the

2    c_user cookie to record user activities and communications.

3        57.    A User's Facebook ID is linked to their Facebook profile, which generally contains

4    a wide range of demographic and other information about the User, including pictures, personal

5    interests, work history, relationship status, and other details.  Because the User's Facebook Profile

6    ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can

7    easily use the Facebook Profile ID to quickly and easily locate, access, and view the User's

8    corresponding Facebook profile.  To find the Facebook account associated with a c_user cookie,

9    one simply needs to type www.facebook.com/ followed by the c_user ID.

10        58.    The Facebook datr cookie identifies the User's web browser.  It is an identifier

11    unique to each person's specific web browser and is another way Facebook can identify Facebook

12    users.

13        59.    The Facebook fr cookie is a combination of the Facebook ID (c_user) and the

14    browser ID (datr) cookie values.

15        60.    A User who accessed Defendant's Website while logged into (or recently having

16    logged into) Facebook would have their browser transmit the c_user, datr and fr cookies to

17    Facebook.

18        61.    At each stage, Defendant also utilized the _fbp cookie, which attaches to a browser

19    as a first-party cookie, and which Facebook uses to identify a browser and a user.

20        62.    Defendant intentionally configured the Tracking Technologies installed on its

21    Website to capture both the "characteristics" of individual's communications with its Website

22    (their IP addresses, Facebook ID, User-IDs, cookie identifiers, device identifiers, emails, and phone

23    numbers) and the "content" of these communications (the buttons, links, pages, and tabs they click

24    and view related to the shopping and products sought from Defendant).

25        63.    Meta can also link the data to a specific user through the "Facebook Cookie."  The

26    Facebook Cookie is a workaround to recent cookie-blocking techniques, including one developed

27    by Apple, Inc., to track users, including Facebook users.

28        64.    Lastly, Meta can link user data to individual users through identifying information

collected through Meta Pixel using what Meta calls "Advanced Matching."  There are two forms of Advanced Matching: manual matching and automatic matching.  Using Manual Advanced Matching the website developer manually sends data to Meta to link users.  Using Automatic Advanced Matching, the Meta Pixel scours the data it receives to search for recognizable fields, including name and email address to match users to their Facebook accounts.[37]

65.    Importantly, even if Meta Pixel collects data about a non-Facebook user, Meta still retains and uses the data collected through Meta Pixel in its analytics and advertising services. These non-users are referred to as having "shadow profiles" with Meta.[38]

66.    At the time Plaintiff used Defendant's Website, she maintained active social media account on Facebook.  Plaintiff accessed the Defendant's Website from the same device she used to visit Facebook, and Meta associated the data it collected about her from Defendant's Website with her Facebook account and other PII.  Meta was also able to associate this information with her identity by matching hashed identifiers (name, phone, email, and address) to its own records.

67.    Meta offers an analogous mobile version of the Meta Pixel known as an SDK to app developers. Meta's SDK allows app developers "to track events, such as a person installing your app or completing a purchase." By tracking these events developers can measure ad performance and build audiences for ad targeting.[39]

68.    Meta's SDK collects three types of App Events.  Automatically Logged Events are "log[] app installs, app sessions, and in-app purchases."  Standard Events are "popular events that Facebook has created for the app."  Custom Events are "events [the app developers] create that are specific to [the] app."[40]

69.    Once the data intercepted through the Meta Pixel or SDK is processed, Meta makes this data available through its Events Manager and Ads Manager pages, along with tools and

---

[37] While Meta purports to "hash" the PII provided by patients, Meta actually uses the hashed format *specifically to link the Meta Pixel data to Facebook profiles*.

[38] Jürgen Graf, *Investigating shadow profiles: The data of others*, TECHXPLORE (Sept. 22, 2023) https://techxplore.com/news/2023-09-shadow-profiles.html.

[39] *Meta App Event Tracking*, META, https://developers.facebook.com/docs/app-events/.

[40] *Meta App Event Tracking: Overview*, META, https://developers.facebook.com/docs/app-events/.https://developers.facebook.com/docs/app-events/overview.

analytics to reach these individuals through future Facebook ads.  For instance, this data can be used to create "custom audiences" to target the user, as well as other Facebook users who match members of the audiences' criteria.[41]

70.    In addition to using the data intercepted through Meta Pixel and SDK to provide analytics services, Meta uses this data to improve its personalized content delivery, advertising network, and machine-learning algorithms, including by improving its ability to identify and target users.

71.    Meta has no way to limit or prohibit the use of data collected through Meta Pixel and its SDK given Meta's open systems and advanced algorithms.

72.    According to leaked internal Meta documents, one employee explained "You pour that ink [i.e., data] into a lake of water . . . at it flows . . . everywhere . . . How do you put that ink back in the bottle? How do you organize it again, such that it only flows to the allowed places in the lake?" [42]

73.    In these same leaked documents, another employee explained Meta does "not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, that is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation." [43]  Thus, once the data enters the Meta system, either through its SDK or Pixel, the data can be used for any and all purposes.

74.    Meta's own employees confirmed no one at Meta can state confidently where all the data about a user is stored and used. In a recent court hearing as part of the Cambridge Analytica scandal of 2018, Meta's own engineers testified there was not a "single person" at Meta who could

---

[41] *Audience Network*, META, https://developers.facebook.com/docs/app-events/overview.https://developers.facebook.com/docs/audience-network/.

[42] Lorenzo Franceschi-Bicchierai, *Facebook Doesn't Know What It Does With Your Data, Or Where It Goes: Leaked Document*, VICE, (Apr. 26, 2022) https://www.vice.com/en/article/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes/.

[43] *Id.*

1    answer that question. [44]

2        75.    Defendant uses at least the Meta Pixel on its Website. As a result, Defendant

3    disclosed and Meta intercepted users'—including Plaintiff's—interactions on the Website.  Meta

4    received at least the customer's name, email, location, and purchase information which it could

5    associate with embedded cookies to further associate the information with the customer's profile.

6    Meta and Defendant used this data, as well as other data uploaded directly to Meta by Defendant,

7    so that Defendant could run advertisements using its services.

8        76.    Plaintiff did not consent to the interception or disclosure of her data to Meta.

9    Defendant's disclosure, and Meta's interception, of Plaintiff's and prospective class members' PII

10   without their consent is an invasion of privacy and violates several laws, including ECPA (18

11   U.S.C. §2511, *et seq.*), CIPA §631, CIPA §632, and CDAFA (Cal. Penal Code § 502), and the

12   California State Constitution.

13       **G.    Attentive's Tracking Technology**

14       77.    Attentive operates one of the largest marketing platforms in the country. "[O]ver

15   27% of the top 1,000 retailers in North America, including: 40% of the top apparel brands, 40% of

16   the top jewelry brands, [and] 33% of the top health and beauty brands" utilize Attentive's

17   marketing services.[45]  Given Attentive's pervasiveness, the company has collected more than "1.8

18   billion email and phone numbers" and "1.4 trillion customer data points."[46]

19       78.    To unlock the "full advantage" of its platform, Attentive requires retailers to

20   integrate the "Attentive Tag" into their websites.[47]  The Attentive Tag captures "behavioral data,

21   page view, product view, add to cart, and purchase events."[48]

22   _____

23   [44] Isober Asher Hamilton, *Senior Facebook engineers say no one at the company knows where your data is kept*, BUSINESS INSIDER, (Sept. 8. 2022) https://www.businessinsider.com/meta-doesnt-know-where-all-your-data-is-engineers-say-2022-9#:~:text=Two%20Meta%20engineers%20were%20grilled,there%20for%20almost%20nine%20years.

25   [45] ATTENTIVE, RETAIL & E-COMMERCE, https://attentive.com/retail-ecommerce-marketing.

26   [46] ATTENTIVE, AUDIENCE MANAGER, https://www.attentive.com/audience-segmentation-manager.

27   [47] ATTENTIVE, THE ATTENTIVE TAG, https://help.attentivemobile.com/hc/en-us/articles/10905920909460-The-Attentive-tag.

28   [48] *Id.*

1    79.     Through the Attentive Tag, Attentive "analyze[s] behaviors across the entire

2    customer life cycle."[49] In exchange for that information, Attentive provides retailers with "a

3    treasure trove of insights about [their] customers' shopping habits, like their browsing and

4    purchasing history."[50]

5    80.     Attentive collects and assimilates personal information into its "Identity Graph,"

6    which is "a web of data built with multiple unique identifiers (e.g. cookies, phone numbers, email,

7    on-site shopping behavior, device information, first name, last name, etc.) with the customer at the

8    center."[51] Through the Identity Graph, Attentive offers retailers "a comprehensive customer

9    profile." *See* Fig. 3.



**Figure 3**

81.     These profiles show various data points, like a consumer's "activities,"

"preferences," "[f]avorite products," and "[d]evices." *See* Fig. 4.



**Figure 4**

---

[49] ATTENTIVE, ANALYTICS, https://www.attentive.com/sms-analytics-and-reporting.

[50] ATTENTIVE, HOW TO MAKE THE MOST OUT OF YOUR WEB TRAFFIC, https://www.attentive.com/blog/web-traffic-optimization.

[51] ATTENTIVE, WHY ATTENTIVE SIGNAL IS THE KEY TO UNLOCKING TOP-PERFORMING CUSTOMER EXPERIENCES, https://www.attentive.com/blog/attentive-signal-faq.

---

82.    Each profile also contains tabs for "Subscriptions," "Activities," "Attributes," and "Offers."[52] *See* Fig. 5.



**Figure 5**

83.    The "Activities" tab reveals the content of the consumer's electronic communications.

84.    To maintain its market share, Attentive constantly innovates to address "signal loss." Signal loss "refers to the diminishing strength of pixel fires on important signals or data points (such as purchase events), which were once reliably tied to campaigns and individual users."[53] To mitigate that loss, Attentive developed "Attentive Signals."

85.    Attentive's Chief Strategy Officer, Eric Miao, best explains the innovation:

> Attentive Signal is our identity product. It's at the core of our platform. It powers everything you can do with it—from optimizing your customer segmentation strategy to triggering top-performing journeys. It collects and attributes a vast amount of shopper data directly to Attentive subscribers. This includes everything from zero-party data, like shopping preferences, to enrichment data, like device information.[54]

86.    Put differently, "Attentive Signal is an identity solution that enables marketers to understand who's shopping on their site, identify specific habits, and build personalized

---

[52] ATTENTIVE, VIEW SUBSCRIBER PROFILES, https://help.attentivemobile.com/hc/en-us/articles/4412398776724-View-subscriber-profiles.

[53] Erik Koenig, *How To Overcome Signal Loss In Digital Marketing Campaigns*, FORBES, Jul. 19 2023), https://www.forbes.com/councils/forbesagencycouncil/2023/07/19/how-to-overcome-signal-loss-in-digital-marketing-campaigns/.

[54] ATTENTIVE, ATTENTIVE SIGNAL, https://www.attentive.com/signal-identity-solution.

experiences."[55]  According to Attentive, it's so effective "that no matter where or how someone chooses to shop, all of their data can be linked back to their unique profile."[56]  It's so effective, in other words, that Attentive can eliminate the "three key factors that contribute to signal loss": "evolving privacy requirements," "advanced ad-blockers," and "savvy customers."[57]

87.    Defendant knows that Attentive uses identifiers and online activity for its own commercial purposes.  Among other things, Attentive makes prominent representations on its website about how it leverages personal information to enhance its platform.  Attentive claims, for example, that it can send more triggered emails than its competitors because it "recognizes over 1 [billion] email addresses and phone numbers across devices."  *See* Fig. 6.



**Figure 6**

88.    Moreover, over the last two years, Attentive has incorporated artificial intelligence into several new products—"AI Journeys," "Audiences AI," and "Identity AI"—that were trained using the "1.4 trillion datapoints" in Attentive's possession.[58]  Since rolling out those products, Attentive has aggressively pitched them to existing customers, stating that their products will soon "help marketers deliver the sorts of truly 1:1 personalized experiences they have always dreamt of (and can deliver without any additional manual work)."[59]  Those pitches have paid off; as of December 2023, "80% of Attentive customers [were] using AI."[60]  Whether or not Defendant

---

[55] *Id.*

[56] ATTENTIVE, *supra* note 51.

[57] *Id.*

[58] ATTENTIVE, MEET ATTENTIVE AI[TM]: AUTOMATED AND INTEGRATED ARTIFICIAL INTELLIGENCE, https://www.attentive.com/blog/attentive-ai.

[59] ATTENTIVE, *supra* note 51.

[60] *Attentive Drives Strong Momentum with 70% of Customers Now Using Its AI Solutions*, BUSINESS WIRE, (Dec. 13, 2023),

1    counts among that 80%, Defendant knows that Attentive created these products by, in part,

2    leveraging personal information from customers who accessed Defendant's Website.

3        89.    Finally, for all retailers that use Attentive's platform, they must provide Attentive

4    with a license to "copy, process and transmit the data, information and other materials transmitted

5    to or through the Platform," including "Customer Data" like "telephone numbers" and "email

6    addresses."[61]  That license also allows Attentive to use Customer Data "to provide and improve the

7    Services."[62]  From that contract alone, Defendant knew that Attentive would use Customer Data to

8    enhance its platform.

9        90.    At a minimum, Defendant uses the Attentive tracking technologies, including the

10   Attentive Tag, on its Website.  As a result, Defendant disclosed and Attentive intercepted

11   consumers'—including Plaintiffs'—interactions on the Website.  Attentive received at least the

12   consumers' purchase information, consumer's name, and email address which it can associate with

13   the consumer's identity.  Attentive and Defendant used this data, as well as other data uploaded

14   directly to Attentive by Defendant, so that Defendant could run advertisements using its services.

15       **H.    Defendant's Use of the Tracking Technologies**

16       91.     Pursuant to agreements with Third Parties (e.g., Meta and Attentive) Defendant

17   intentionally and voluntarily embedded the Tracking Technologies on the Website.  As illustrated

18   within this section, Defendant unlawfully disclosed personally identifiable information to Third

19   Parties through Tracking Technologies, without customers' consent, contrary to its express

20   warranties.

21       92.    The Tracking Technologies are Source Code that do just that—they surreptitiously

22   transmit a Website User's communications and inputs to the corresponding user IDs, much like a

23   traditional wiretap.

24       93.    For example, when individuals visit Defendant's Website via an HTTP request to

25   _____

26   https://www.businesswire.com/news/home/20231213790998/en/Attentive-Drives-Strong-
     Momentum-with-80-of-Customers-Now-Using-Its-AI-Solutions.

27   [61] ATTENTIVE, ATTENTIVE MASTER SUBSCRIPTION AGREEMENT,
     https://www.attentive.com/legal/msa.

28   [62] *Id.*

Defendant's server, Defendant's server sends an HTTP response (including the Markup) that displays the webpage visible to the User, along with Source Code (including the Tracking Technologies).

94.     Thus, Defendant is, in essence, handing its customers a tapped website and, once a webpage is loaded into the patient's browser, the software-based wiretaps are quietly waiting for private communications on the webpage to trigger the Tracking Technologies, which then intercept those communications—intended only for Defendant—and instantaneously transmit those communications to Meta, Attentive, or other third parties.

95.     Third Parties — including Meta and Attentive — offer companies, including Defendant, snippets of code they can install in web browsers of users logged into their services. These code snippets uniquely identify the user and are sent with each intercepted communication to ensure the third party can identify the specific user associated with the information intercepted (in this case, confidential PII and purchase information).

96.     Defendant intentionally configured the Tracking Technologies installed on its Website to capture both the "characteristics" of individual's communications with its Website (their IP addresses, Facebook ID, User-IDs, cookie identifiers, device identifiers, emails, and phone numbers) and the "content" of these communications (the buttons, links, pages, and tabs they click, and view related to the shopping and products sought from Defendant).

97.     Defendant installs these Tracking Technologies despite its understanding that its customers reasonably anticipate their identifiable information to be kept confidential and undisclosed to Third Parties.  This installation contradicts Defendant's promise to keep PII confidential.  *See*, *supra*, Fig. 2.

98.     Contrary to its promise, as soon as consumers enter Defendant's Website, Defendant begins tracking and disclosing their interactions with the Website to the Third Parties.

99.     When users access the Website, Defendant discloses the URLs and page titles of every page that they visit, including during the checkout process.  The URLs and page titles disclose what type of product the user is seeking to purchase.  For example, when a consumer clicks on a product, the URL of the page for that product, which includes information about the

product is shared, is shared with Third Parties as enabled by Defendant. The Third Parties also receive information when the consumer adds the product to their cart before checkout. *See, e.g.*, Fig. 7 (product page), Fig. 8 (Attentive Interception); Fig. 9 (Meta Interception).



**Figure 7**

**Figure 8**

1

2

3

4

5

6

7

8

9

10

11

12

13

Facebook - Add to cart
GET    www.facebook.com

Cookies:
sb      _rqLaPZort5KEv5CqwzbwveY
datr    _rqLaAE2EkxmUnyJunQmCVkj
dpr     1.25
c_user  100094052384262
xs      24%3ASI4iS7WeOSQAVg%3A2%3A1756820170%3A-1%3A-1
fr
        0tiXocf3YKYeqWuNM.AWdwCMOOkEctcyiDWfJdUrvVrwD7x1n8B8tlXvLmK4Nn44f__R
0.Boi7r-..AAA.0.0.BotvLO.AWdhbLMLsyy1wPXVkR6X9Ara6zs
ar_debug    1

Data:
id      140276179885771
ev      AddToCart
dl      https%3A%2F%2Fwww.barefootdreams.com%2Fproducts%2Fcozychic-ultra-lite-cable-
knit-ankle-pant
rl
if      false
ts      1756822151041
cd[content_ids]     43494366347357
cd[content_name]    Teaberry%20%2F%20S
cd[content_type]    product
cd[value]       158.0
cd[currency]    USD
sw      3072
sh      1728
v       2.9.227
r       stable
ec      1
o       12317
fbp     fb.1.1756822109150.887680186450731735
ler     empty
cdl     API_unavailable
plt     3078.9000000953674
it      1756822036236
coo     false
expv2%5B%5D     pl1
expv2%5B%5D     el0
expv2%5B%5D     bc1
rqm     GET

**Figure 9**

100.    Defendant also discloses confidential details about the purchase and personal information about the user to Third Parties in various forms throughout the checkout process.

101.    Meta has tracking technology on the Website throughout the checkout process, including the sb, datr, dpr, c_user, xs, and fr cookies.

102.    For instance, when a user selects the checkout button, Meta receives a button click in the form of a checkout value, which it associates with a user's fbp, cookies, and other unique identifiers, including hashed values for their full name, email, and phone number.  Figure 10, on the following page, illustrates these interceptions.  For example, Defendant transmits to Meta the customer's hashed first name (audff[fn] and udff[fn] values), last name (audff[ln] and udff[ln] values), phone (audff[ph] and udff[ph] values), email (audff[em] and udff[em] values), zip code (audff[zp] and udff[zp] values), city(audff[ct] and udff[ct] values).  *See e.g.,* Fig. 10.

**Figure 10**

103.    Attentive receives similar information (i.e. full name, email, and street address) in a plain text format (i.e., not hashed), which it is able to associate with purchases and the detailed consumer profile it has by linking the events with the user's identifying information.

**I.    Defendant Did Not Anonymize Consumer Data By Disclosing "Hashed" Values To Third Parties**

104.    The Federal Trade Commission routinely evaluates privacy representations by companies.  When it comes to hashing the FTC has said the following:

Companies often claim and act as if data that lacks clearly identifying

information is anonymous, but data is only anonymous when it can never be associated back to a person. If data can be used to uniquely identify or target a user, it can still cause that person harm.

One way that companies obscure personal data is through "hashing." Hashing involves taking a piece of data—like an email address, a phone number, or a user ID—and using math to turn it into a number (called a hash) in a consistent way: the same input data will always create the same hash.

. . .

This logic is as old as it is flawed – hashes aren't "anonymous" and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized. FTC staff will remain vigilant to ensure companies are following the law and take action when the privacy claims they make are deceptive.[63]

105.    Thus, Defendant sent and Third Parties intercepted Plaintiff and Class Members personally identifiable information regardless of whether it was hashed or plain text.

## CLASS ALLEGATIONS

106.    **Class Definition:** Plaintiff brings this action individually and on behalf of various classes of persons similarly situated, as defined below, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

The **Nationwide Class** that Plaintiff seeks to represent is defined as:
All individuals residing in the United States who made a purchase on the website, www.barefootdreams.com, during the Class Period.

The **California Subclass** that Plaintiff seeks to represent is defined as:
All individuals residing in California who made a purchase on the website, www.barefootdreams.com, during the Class Period.

107.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

108.    The Nationwide Class and California Subclass are referred to collectively as the

---

[63] *No, hashing still doesn't make your data anonymous*, FEDERAL TRADE COMMISSION (Jul. 24, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous.

"Classes."

109.    Excluded from the proposed Classes are Defendant; any affiliate, parent, or subsidiary of Defendant, any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant, any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

110.    Plaintiff reserves the right to amend the definitions of the Class or Subclass and add subclasses if further information and discovery indicate that the definitions should be narrowed, expanded, or otherwise modified.

111.    **Numerosity:** Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiff at this time.  However, it is estimated that there are at least thousands of individuals in the Classes.  The identity of such membership is readily ascertainable from Defendant's records and third-parties Meta and Attentive's records.

112.    **Existence and Predominance of Common Questions of Fact and Law:** There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Classes.  The questions of law and fact common to the proposed Classes predominate over questions affecting only individual class members.  Such questions include, but are not limited to, the following:

    a.   Whether Defendant's acts and practices violated the ECPA.

    b.   Whether Defendant's acts and practices violated CIPA § 631;

    c.   Whether Defendant's acts and practices violated CIPA § 632;

    d.   Whether Defendant's acts and practices violated CDAFA § 502, *et seq.*;

    e.   Whether Defendant's acts and practices violated the privacy rights of Plaintiff and members of the California Class under the California Constitution; and

    f.   Whether Plaintiff and members of the proposed Classes are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

113.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the

Classes because the Plaintiff, like all other class members, visited the Website and had her confidential electronic communications intercepted and disclosed to Third Parties.

114.    **Adequacy:** Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the Classes she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

115.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Classes.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.  Finally, Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Classes as a whole.

**CAUSES OF ACTION**

**COUNT I**

**Violation Of The Electronic Communication Privacy Act,**
**18 U.S.C. § 2511, *et seq.***
**(On Behalf of the Nationwide Class)**

116.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

117.    Plaintiff brings this claim on behalf of herself and members of the Nationwide Class.

118. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

119. The ECPA protects both the sending and the receipt of communications.

120. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

121. The transmission of Plaintiff's sensitive and personal information to Defendant's website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

122. The transmission of PII between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

123. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

124. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

125. The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5).

126. The following instruments constitute "devices" within the meaning of the ECPA:

   a. The computer codes and programs Defendant and Meta used to track Plaintiff's and Class Members' communications while they were navigating the Website;

   b. The computer codes and programs Defendant and Attentive used to track Plaintiff's and Class Members' communications while they were navigating the Website;

   c. Plaintiff's and Class Members' browsers;

d.   Plaintiff's and Class Members' mobile devices;

e.   Defendant's and Meta's web and ad servers;

f.   Defendant's and Attentive's web and ad servers

g.   The plan that Defendant and Meta carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website; and

h.   The plan that Defendant and Attentive carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

127.   Plaintiff's and Class Members' interactions with Defendant's website are electronic communications under the ECPA.

128.   By utilizing and embedding the tracking technologies provided by Meta and Attentive on the Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

129.   Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technologies provided by Meta and Attentive on its website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and sensitive and personal information to Meta and Attentive.

130.   The Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding their PII, including their identities and information related to their purchase on the Website.  This confidential information is then monetized for targeted advertising purposes, among other things.

131.   By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to Meta and Attentive through the Tracking Technologies, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

132.    By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

133.    Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy.

134.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

135.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may award statutory damages to Plaintiff and Class Members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future; reasonable attorney's fees; and other litigation costs reasonably earned.

## COUNT II

**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631**
**(On Behalf of the California Subclass)**

136.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

137.    Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

138.    The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630–638. CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ." Cal. Penal Code § 630.

139. A person violates California Penal Code § 631(a), if:

> By means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

140. Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

141. To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u> parties to a communication.

142. At all relevant times, Defendant aided, agreed with, and conspired with the Third Parties to track and intercept Plaintiff's and Class Members' internet communications while accessing the Website. These communications were intercepted without the authorization and consent of Plaintiff and Class Members

143. Defendant, when aiding and assisting the Third Parties' wiretapping and eavesdropping, intended to help the Meta and Attentive learn some meaning of the content in the URLs and the content the visitor requested.

144. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Technologies fall under the broad catch-all category of "any other manner":

    a. The computer codes and programs the Third Parties used to track Plaintiff and Class Members' communications while they were navigating www.barefootdreams.com;

b.  Plaintiff's and Class Members' browsers;

c.  Plaintiff's and Class Members' computing and mobile devices;

d.  Meta's web and ad servers;

e.  Attentive's web and ad servers;

f.  The web and ad-servers from which the Third Parties tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.barefootdreams.com;

g.  The computer codes and programs used by the Third Parties to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.barefootdreams.com; and

h.  The plan the Third Parties carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to visit www.barefootdreams.com.

145.    The information that Defendant transmitted using Tracking Technologies constituted sensitive and confidential personally identifiable information.

146.    As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting the Third Parties to receive its customers' sensitive and confidential online communications through www.barefootdreams.com without their consent.

147.    As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 per violation or three times the amount of actual damages.  Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered or be threatened with, actual damages." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

## COUNT III

### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 632
### (On Behalf of the California Subclass)

148. Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

149. Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

150. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication.

151. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

152. The data collected on Defendant's Website constitutes "confidential communications," as that term is used in Section 632, because class members had an objectively reasonable expectation of private with respect to their personally identifiable information.

153. Plaintiff and Class Members expected their communications to Defendant to be confined to Defendant in part, because of Defendant's consistent representations that these communications would remain confidential. Plaintiff and Class Members did not expect third parties, and specifically Meta and Attentive, to secretly eavesdrop upon or record this information and their communications.

154. The Tracking Technologies from Third Parties, are all electronic amplifying or recording devices for purposes of § 632.

155. By contemporaneously intercepting and recording Plaintiff's and Class members' confidential communications to Defendant through this technology, the Third Parties eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

156. At no time did Plaintiff or Class members consent to Defendant or Third Parties

conduct, nor could they reasonably expect that their communications to Defendant would be overheard or recorded by Third Parties.

157.    The Third Parties utilized Plaintiff's and Class members' personally identifiable information for their own purposes, including advertising and analytics.

158.    Defendant is liable for aiding and abetting violations of Section 632 by the Third Parties (i.e., Meta and Attentive).

159.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Members of the California Subclass have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

<u>**COUNT IV**</u>

**Violation of the Comprehensive Computer Data and Access and Fraud Act
Cal. Penal Code § 502, *et seq.*
(On Behalf of the California Subclass)**

160.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

161.    Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

162.    The California Comprehensive Computer Data Access and Fraud Act ("CDAFA") was enacted to provide protection from "tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

163.    CDAFA affords a private right of action to owners of computers, systems, networks, programs, and who suffer damage or loss as a result of a violation of the Act. *See* Cal. Penal Code § 502(e)(1).

164.    Relevant here, Cal. Penal Code § 502 imposes civil liability on anyone who:

(c)(2)    Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;

(c)(3)    Knowingly and without permission uses or causes to be used computer services.

(c)(6)    Knowingly and without permission provides or assists in providing a

means of accessing a computer, computer system, or computer network in violation of this section.

(c)(7)    Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

(c)(8)    Knowingly introduces any computer contaminant into any computer, computer system, or computer network.

165.    Under § 502 of the California Penal Code "[f]or purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." Cal. Penal Code § 502(j).

166.    "Computer services" under the CDAFA "includes, but is not limited to, computer time, data processing, or storage functions, internet services, electronic mail services, electronic message services, or other uses of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(4).

167.    "Computer network" is "any system that provides communications between one or more computer systems and input/output devices, including, but not limited to, display terminals, remote systems, mobile devices, and printers connected by telecommunication facilities." Cal. Penal Code § 502(b)(2).

168.    "Computer system" is "a device or collection of devices, including support devices…one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

169.    "Data" is defined as "a representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions" that "may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

170.    "Computer contaminant" is defined as "any set of computer instructions that are

designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consumer computer resources, modify, destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network." Cal. Penal Code § 502(b)(12).

171.    Defendant's conduct, described herein, violates Cal. Penal Code §§ 502(c)(2), (3), (4), (6), (7), and (8).

172.    Plaintiff and California Subclass members were the owners or lessees of the computers, computer systems, computer networks, and data described herein.

173.    Defendant violated Cal. Penal Code § 502(c)(2) by knowingly accessing and without permission taking, copying, analyzing, and using Plaintiff's and the California Class members' data and sharing it with Third Parties.

174.    In violation of Cal. Penal Code § 502(c)(8), Trade Desk knowingly introduced and continues to introduce computer contaminants into Plaintiff's and the California Subclass members' computer, computer system, or computer network.  Among other things, Defendant introduced Tracking Technologies from Meta and Attentive.  The Tracking Technologies are designed to, and do, self-propagate to contaminate users' computers, computer systems, and computer networks to record and transmit data that would not otherwise be transmitted or recorded in the normal operation of the computers, computer systems, and computer networks. These technologies usurp the normal operation of Plaintiff's and California Subclass's computing devices because they supplant Plaintiff's and California Subclass' choices in how those devices and their resources are used.

175.    In violation of §§ 502(c)(2)-(3), (6)-(8), Defendant knowingly took, copied, accessed, used, caused to be used, altered, and added Plaintiff's and California Subclass' data, computers, computer services, and computer networks.  Among other things, Defendant knowingly introduced its technologies into Plaintiff's and California Subclass' computers, computer systems,

and computer networks and provided itself and other entities the means of accessing Plaintiff's and California Subclass' computers, computer systems, and computer networks in violation of CDAFA by developing the technologies and encouraging and providing the means for websites and other online services to use and deploy them on their platforms.

176.    Defendant makes use of Plaintiff's and California Subclass members' valuable data to obtain money through advertising

177.    Defendant's use of Plaintiff's and California Subclass members' data is wrongful and unlawful, as described herein

178.    Plaintiff and Class Members suffered economic injury because Defendant caused numerous third parties—including Meta and Attentive—to unjustly profit from Plaintiff's and Class Members' personal information and online activity.

179.    It would not be equitable to allow those third parties to keep those profits, which were generated by Defendant's violations of Plaintiff and Subclass member's privacy interests.

180.    As a direct and proximate result of Defendant's unlawful conduct within the meaning of Cal. Penal Code § 502, Defendant has caused loss to Plaintiff and the California Subclass members in an amount to be proven at trial.

181.    Plaintiff, on behalf of herself and the California Subclass, seeks compensatory damages and/or disgorgement in an amount to be proven at trial, and declaratory, injunctive, or other equitable relief.

182.    Plaintiff and members of the California Subclass are entitled to punitive damages because Defendant's violations were willful, and, upon information and belief, Defendant is guilty of oppression, fraud, or malice within the meaning of Cal. Civil Code § 3294 such that Plaintiff and Class Members are entitled to recovery of exemplary damages under Cal. Penal Code § 502(e)(4).

183.    Plaintiff and Class Members are also entitled to recover reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

**COUNT V**
**Invasion of Privacy Under California's Constitution**
**(On Behalf of the California Subclass)**

184.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

185.    Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

186.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination of their sensitive, confidential online communications; and (2) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

187.    At all relevant times, by using the Tracking Technologies to record and communicate their sensitive and confidential online communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

188.    Plaintiff and Class Members had a reasonable expectation that their sensitive and confidential online communications, identities, and other data would remain confidential and that Defendant would not install wiretaps on www.barefootdreams.com .

189.    Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' sensitive confidential online communications.

190.    The invasion of privacy was serious in nature, scope, and impact because it related to their sensitive and private online communications.  Moreover, it constituted an egregious breach of societal norms underlying the privacy right because Defendant promised to keep Plaintiff and Members of the California Subclass's communications confidential.

191.    Accordingly, Plaintiff and members of the California Subclass seek all relief available for invasion of privacy claims under California's Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the putative Nationwide Class and California Subclass defined above, naming Plaintiff as the representative of the putative Classes, and naming Plaintiff's attorneys as Class Counsel to represent the putative Class and Subclass Members;

(b)    For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the putative Classes on all counts asserted herein;

(d)    For statutory damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For injunctive relief as pleaded or as the Court may deem proper; and

(g)    For an order awarding Plaintiff and the putative Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury for any and all issues in this action so triable of right.

Dated:  October 14, 2025              Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Philip L. Fraietta*
      Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Tel: (914) 874-0710
Fax: (914) 206-3656
E-Mail: pfraietta@bursor.com

*Counsel for Plaintiff*